IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| OUTOKUMPU STAINLESS USA, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 16-00378-KD-C |
| | ) | |
| CONVERTEAM SAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF OUTOKUMPU STAINLESS USA, LLC'S MOTION TO
REMAND OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO
TAKE LIMITED DISCOVERY REGARDING THE ALLEGED
"AGREEMENT FOR CONSORTIAL COOPERATION" AND
INCORPORATED SUPPORTING BRIEF**

Ricardo A. Woods (WOODR1019)
BURR & FORMAN LLP
RSA Tower, Suite 22200
11 North Water Street
Mobile, Alabama  36602
Telephone: 251-344-5151
Facsimile:  251-344-9696
rwoods@burr.com

Devin C. Dolive (DOLID4671)
David G. Wanhatalo (WANHD6977)
BURR & FORMAN LLP
420 North 20th Street
Wells Fargo Tower, Suite 3400
Birmingham, Alabama  35203
Telephone:  205-251-3000
Facsimile:  205-458-5100
ddolive@burr.com
dwanhatalo@burr.com

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION & PROCEDURAL BACKGROUND ................................................. 1

II.  FACTS, AS PLEADED IN THE NOTICE OF REMOVAL AND ITS
     ATTACHMENTS .................................................................................................... 3

III. ARGUMENT ........................................................................................................... 7

     A.   There Is No Federal-Question Subject-Matter Jurisdiction. .................................. 7

          1.   Converteam Has Not Pleaded That the Present Action Is Subject
               To an Agreement To Arbitrate. ................................................. 14

          2.   There Is No Federal-Question Jurisdiction Because Converteam
               is Not a Signatory To the Agreement It Seeks To Enforce ...................... 14

          3.   There Is No Federal-Question Jurisdiction Because the
               Signatories To the TK/FL Contracts Were Domestic
               Companies ................................................................................. 17

     B.   Alternatively, Even if Jurisdiction Exists, There Is No Basis for
          Arbitration. ............................................................................................. 21

     C.   Alternatively, This Court Should Allow Outokumpu To Take Limited
          Discovery Regarding the Alleged "Agreement of Consortial
          Cooperation." ............................................................................................ 25

IV.  CONCLUSION ..................................................................................................... 26

**PLAINTIFF OUTOKUMPU STAINLESS USA, LLC'S MOTION TO
REMAND OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO
TAKE LIMITED DISCOVERY REGARDING THE ALLEGED
"AGREEMENT FOR CONSORTIAL COOPERATION" AND
INCORPORATED SUPPORTING BRIEF**

Plaintiff Outokumpu Stainless USA, LLC ("Outokumpu") moves, pursuant to 28 U.S.C.
1447(c), to remand this action to the Circuit Court for Mobile County, Alabama or, in the
alternative, for leave to take limited discovery regarding the alleged "Agreement for Consortial
Cooperation" relied on in the Motion to Compel Arbitration (Doc. 6) filed by Defendant GE
Energy Power Conversion France SAS, Corp ("GE Energy France"), formerly known as
Converteam SAS ("Converteam").  In support hereof, Outokumpu shows as follows:

**I.
INTRODUCTION & PROCEDURAL BACKGROUND**

GE Energy France removed this action to this Court, citing, in its Notice of Removal,
both (i) federal-question jurisdiction under 28 U.S.C. § 1331, per the New York Convention
amendments to the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. § 201, *et seq.*, and (ii)
diversity jurisdiction under 28 U.S.C. § 1332, based on the alleged "fraudulent joinder" of
certain other Plaintiffs (not Outokumpu).   This Motion to Remand addresses the first basis
(federal-question jurisdiction) in detail; the second basis (diversity jurisdiction) is being
addressed in a separate Motion (Doc. 34) that other Plaintiffs have filed contemporaneously
herewith and with which Outokumpu joins, including Sections III.D. and E. (pages 17 through
25) of that Motion.

As to the first basis, GE Energy France asserts the purported "federal question" via the
New York Convention amendments to the FAA (a federal statute).   These amendments
specifically create federal-question jurisdiction over certain international commercial disputes
subject to arbitration under treaty (the New York Convention).  However, GE Energy France's

Notice of Removal is facially deficient because there is no agreement to arbitrate in writing between Outokumpu and GE Energy France, as required by the New York Convention.

In its Notice of Removal, GE Energy France claims that the dispute-resolution clauses in a series of contracts between two U.S. entities, ThyssenKrupp Stainless USA, LLC and F.L. Industries, Inc., fall under the New York Convention. Contrary to the misquote on page 3 of GE Energy France's Motion to Compel Arbitration (Doc. 6), this clause provides:

> 23.1   All disputes arising **between** **both** **parties** in connection with or in the performances of the Contract shall be settled through friendly consultation **between** **both** **parties**. In case no agreement can be reached through consultation after a maximum period of 30 days ... any such dispute shall be submitted to arbitration.

(Doc. 1-1, Verdier Decl. Exs. A, B, & C, TK/FL Contracts, ¶ 23.1) (filed under seal) (emphasis added).)

The TK/FL Contracts' dispute-resolution clauses are narrowly drafted so as to apply only to disputes between **both** of the named parties. The clauses provide a mechanism for the two named parties to initiate and conduct arbitration, while providing no means by which GE Energy France or any other non-party can initiate arbitration. The plain reading of the dispute-resolution clauses is that they apply only to "ThyssenKrupp Stainless USA, LLC" and "F.L. Industries Inc."

Because GE Energy France has no written contract with Outokumpu and has not signed any agreement providing for arbitration with Outokumpu (much less with its insurer, Sompo Japan Insurance Company of America ("Sompo")), the inquiry into the New York Convention's applicability (and thus the federal question) should end there. GE Energy France has not adequately pleaded in its Notice of Removal that this action meets the prerequisites required in order to "fall within" the New York Convention amendments to the FAA.

However, GE Energy France has also filed a Motion to Compel Arbitration (Doc. 6), which is directed at Outokumpu and Sompo, and a Motion to Dismiss (Doc. 7) directed at other

2

Plaintiffs.   Pursuant to the Court's August 10, 2016 Order:  "The plaintiffs need not file separate responses directed to defendant's motion to compel arbitration and dismiss (Doc. 6) and separate motion to dismiss the claims of the OTK Oyj subrogees (Doc. 7); instead, they may simply incorporate into their motions to remand all such relevant arguments."   (Doc. 29, p. 3.) Accordingly, Outokumpu also incorporates herein its arguments about why arbitration should not be compelled.  If, however, the Court keeps jurisdiction over this matter,[1] Outokumpu asks, in the alternative, that it be permitted leave to take limited discovery regarding the "Agreement for Consortial Cooperation" that GE Energy France relies on in its Motion to Compel Arbitration (Doc. 6), such that Outokumpu may more fully respond to the arguments that GE Energy France raises.

In short, there is neither federal-question nor diversity jurisdiction, and this matter should be remanded to the Circuit Court of Mobile County, Alabama.

## II.
## FACTS, AS PLEADED IN THE NOTICE OF REMOVAL AND ITS ATTACHMENTS

1.       Plaintiff Outokumpu owns a stainless steel manufacturing facility located in Calvert, Alabama (the "Facility").  (*See* Doc. 1-2, Compl. ¶ 1.)

2.       The Facility consists of, *inter alia*, Cold Rolling Mills ("CRMs"), used to produce cold-rolled flat-finished stainless steel.  (*See id.* at ¶ 12.)

---

[1] Plaintiffs Sompo Japan Insurance Company of America, Pohjola Insurance Limited, AIG Europe Limited, Tapiola General Mutual Insurance Company, Axa Corporate Solutions Assurance SA UK Branch, HDI Gerling UK Branch, MSI Corporate Capital Ltd, and Royal & Sun Alliance PLC (collectively, the "Insurers") have contemporaneously filed their own Motion to Remand (Doc. 34) and address therein the alleged "fraudulent joinder" that Converteam uses to allege diversity jurisdiction under 28 U.S.C. § 1332.  There is no diversity jurisdiction under 28 U.S.C. § 1332 for the reasons stated in the Insurers' Motion, which Outokumpu joins and incorporates herein, including Sections III.D. and E (pages 17 through 25) of that Motion.

3.      The CRMs require certain motors and electrical equipment in order to operate properly.  Each CRM was to be constructed with three motors:  (i) an Entry Motor; (ii) a Stand Motor; and (iii) an Exit Motor.  (*See id.* at ¶ 13.)

4.      On November 25, 2007, ThyssenKrupp Stainless USA, LLC ("TK Stainless") contracted with F.L. Industries Inc. ("F.L. Industries") through a series of contracts for the purchase, delivery, and commissioning of the Cold Rolling Mills (the "TK/FL Contracts").  (*See* Doc. 1-1, Verdier Decl. Exs. A, B, & C (filed under seal).) The specifications for the CRMs included a total of nine motors for the facility, three for each mill, Cold Rolling Mill 54 ("CRM 54"), Cold Rolling Mill 64 ("CRM 64"), and Cold Rolling Mill 74 ("CRM 74"), as well as technical specifications for installation of those components.  (*See id.*; *see also* Doc. 1-2 Compl., ¶ 14.)

5.      In their preamble, the TK/FL Contracts identify ThyssenKrupp Stainless USA, LLC as "Buyer" and identify F.L. Industries, Inc. as "Seller," and the "Buyer" and "Seller" are also collectively defined as the "Parties" to the Contracts.  (*See* Doc. 1-1, Verdier Decl. Exs. A, B, & C (filed under seal).)

6.      In paragraph 2.1, entitled "Scope of Contract," F.L. Industries agreed to sell and deliver the motors in accordance with the technical specifications of the contract and to complete "all Work necessary to hand over the Contract Equipment to the Buyer in a finished state suitable for its intended use ...."  (*See id.*)

7.      F.L. Industries, as "Seller" agreed, in paragraph 12.2 of the Contracts that:

> The Seller shall not subcontract part of the work under the Contract in contradiction to the Sub-contractor list in Annex A 3 Part 2 without the prior consent of the Engineer which shall not unreasonably be withheld.

> The Seller shall be responsible for the acts, defaults and neglects of any of the Sub-contractor, his agents, servants or workmen as fully

4

> as if they were the acts, defaults or neglects of the Seller and/or his
> agents, servants or workmen.

(*Id*.)

8.      Thus, the TK/FL Contracts contemplated that F.L. Industries would choose its vendors/subcontractors from among those listed in "Annex A3," which included a passing reference to "Converteam" **as one of four** possible "Brands or Manufactures" of "Electrical equipment and systems for automation and control." (*See id.*, Annex A3, p. 4 (filed under seal)). The TK/FL Contracts also provide, however, in paragraph 12.2: "The Seller shall use reasonable efforts to consider services and supplies from companies based in the State of Alabama under competitive conditions." (*See id*.)

9.      Other than listing "Converteam" as a potential vendor/subcontractor in Annex A3, there is no other mention of "Converteam" in the TK/FL Contracts. (*See id.*)

10.     In fact, there is no reference in the TK/FL Contracts to any specific sub-contract between F.L. Industries and any other entity regarding design and/or manufacture of the motors sold to TK Stainless. (*See id.*)

11.     Paragraph 23.1 of the TK/FL Contracts contains the following language related to the dispute-resolution procedures and the scope of any arbitrations:

> 23.1    All disputes arising **between <u>both</u> parties** in connection with or in the performances of the Contract shall be settled through friendly consultation **between <u>both</u> parties.** In case no agreement can be reached through consultation after a maximum period of 30 days or as soon as one of the parties involved appeals for the arbitration tribunal the dispute shall be considered as failed and any such dispute shall be submitted to arbitration for settlement.
>
> 23.2    The arbitration shall take place In Düsseldorf, Germany, and shall be conducted in accordance with the Rules of Arbitration of the International Chamber of Commerce, Paris, (ICC Rules) in the English language by three arbitrators appointed in accordance with said rules.

28073433 v1

23.3    The award given by arbitration shall be final and binding and **both parties** shall abide by such award.

***

23.6    In the course of arbitration the Contract shall be executed continuously by **both parties** except for those claims under arbitration.

(*Id.* (emphasis added).)

12.     According to paragraph 29.5, the TK/FL Contracts only became effective when signed by "both Parties."  (*Id.*)

13.     On page 68 of the TK/FL Contracts, Dr. Michael Rademacher and Michael Lutter signed on behalf of TK Stainless, as did Jean Ledoux on behalf of F.L. Industries.   No representative of Converteam or of any other third party was a signatory to the TK/FL Contracts.  (*Id.*)

14.     Only after the TK/FL Contracts were signed did F.L. Industries -- allegedly -- enter into its "Agreement for Consortial Cooperation" with Converteam and with yet another entity, DMS SA.  (Doc. 1-1, Verdier Decl. Ex. D (filed under seal).)

15.     This "Agreement for Consortial Cooperation" is dated December 18, 2007 (*see id.*), but Outokumpu had **no knowledge** of the terms of this Agreement until another party, Fives St Corp., filed an unauthenticated copy of this document in the Mobile County Circuit Court on July 9, 2015.  (*See* Doc. 33-1, Fives Mem. of Law, ¶ 6.)  This was **seven-and-a-half years after** the Agreement was allegedly entered into.

16.     Meanwhile, on or about June 13, 2014, a Converteam motor on CRM 54 at the Facility in Calvert failed catastrophically, after less than two years of operation.  (*See* Doc. 1-2, Compl. ¶ 17.)  Following this catastrophic failure of the Entry Motor, the entire CRM 54 was out of operation for more than six months.  (*See id.* at ¶ 23.)

17.     As a result of this catastrophic failure, Outokumpu boroscoped the motors and found similar issues in all nine Converteam motors, adversely affecting operations on CRM 54, CRM 64, and CRM 74 at the Facility in Calvert and causing millions of dollars' worth of damages.  (*See id.* at ¶¶ 20-21, 24.)

## III.
## ARGUMENT

The "procedure for removal of causes otherwise provided by law" is spelled out in 28 U.S.C. § 1446(a), which requires the filing of "a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal ...."  28 U.S.C. § 1446(a).  "By design, § 1446(a) tracks the general pleading requirements stated in Rule 8(a) of the Federal Rules of Civil Procedure."  *Dart Cherokee Basin Operating Co. v. Owens*, 135 S.Ct. 547, 553 (2015).  As such, a notice of removal should comply with the pleading requirements of Rule 8(a), as set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  A notice of removal should allege "sufficient factual matter" and should contain "more than labels and conclusions."  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 545.  Otherwise, "[w]here a removal notice fails to make the basis for federal jurisdiction clear and does not contain enough information for the district judge to determine whether jurisdiction exists, it is defective."  *Covert v. Auto. Credit Corp.*, 968 F. Supp. 2d 746, 749 (D. Md. 2013).

### A.     There Is No Federal-Question Subject-Matter Jurisdiction.

The FAA has been amended to provide for enforcement of arbitration agreements governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  *See* 9 U.S.C. § 201.  As a signatory to the New York Convention, the United States has agreed to enforce written agreements to submit

international commercial disputes to arbitration and has vested federal courts with subject-matter jurisdiction over disputes involving arbitration agreements governed by the New York Convention.

Therefore, any inquiry into federal subject-matter jurisdiction must begin with the language of the New York Convention itself. *See Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1291 (11th Cir. 2004). Article II of the Convention provides:

> 1.      Each contracting state shall recognize **an agreement in writing** under which **the parties** undertake to submit to arbitrational power any differences which have arisen or which may arise between them, in respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
>
> 2.      The term "agreement in writing" shall include **an arbitral clause** in a contract or an arbitration agreement, **signed by the parties** or contained in exchanged letters or telegrams.
>
> 3.      The court of a contracting state, when seized of an action in respect of which **the parties have made an agreement** within the meaning of this article, shall, **at the request of one of the parties, refer the parties to arbitration**, unless it finds that the said agreement is null and void, inoperable, or incapable of being performed.

Convention on the Recognition & Enforcement of Foreign Arbitral Awards ("New York Convention"), art. II, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (emphasis added). To allow federal oversight of the U.S.'s treaty obligations under the Convention, Congress amended the FAA in 1970 to allow for removal of state court actions involving New York Convention arbitration agreements to federal district court:

> Where the subject matter of an action or proceeding pending in a State Court **relates to an arbitration agreement or award falling under the Convention**, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 U.S.C. § 205 (emphasis added).

The Eleventh Circuit has held that a party asserting federal-question jurisdiction under these FAA amendments must show the following:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005). Unless each of these prerequisites is met, there can be no federal-question jurisdiction.[2]

### 1. GE Energy France Has Not Pleaded That the Present Action Is Subject To an Agreement To Arbitrate.

There is no "agreement in writing" providing for arbitration between Outokumpu and GE Energy France. GE Energy France has not and cannot show "a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *See Upper Lakes Towing Co. v. ZF Padova SpA*, No. 2:08–CV–63, 2009 WL 4730762, at *2 (W.D. Mich. Dec. 4, 2009) (quoting *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 502 (6th Cir. 2007)).

Outokumpu's Circuit Court Complaint is of no assistance to GE Energy France. This action arises from Converteam's **tortious acts**. Outokumpu's claims arise under Alabama law and include claims for negligence, products liability, and implied warranty (pleaded in the

---

[2] Outokumpu will concede that Converteam's Notice of Removal satisfies at least the second *Bautista* element, insofar as Converteam has pleaded the existence of an agreement (albeit not one with Converteam) providing for "arbitration in the territory of a signatory of the Convention" – Germany is a signatory to the Convention. Also, as to the third *Bautista* element, at least as between TK Stainless and F.L. Industries, the legal relationship under the TK/FL Contracts involved a multi-million-dollar purchase of equipment and is undoubtedly commercial.

alternative), and none of these claims arise from a written agreement. Outokumpu's claims against Converteam are not based upon any written contract. Outokumpu's contractual remedy is against F.L. Industries, and Outokumpu has brought these contractual claims in a separate action, presently on the Mobile County Circuit Court's administrative docket pending the appeal of an arbitration order to the Alabama Supreme Court.[3] Although the TK/FL Contracts make F.L. Industries contractually liable for the "acts, defaults and neglects" of its sub-contractors, these Contracts do not address TK Stainless's claims against sub-contractors, nor do they otherwise offer third parties any protection from suit for their own, independent wrongdoing.

In its Notice of Removal, GE Energy France seeks to establish arbitrability through a "surrogate" agreement – GE Energy France pleads that Outokumpu's claims relate to an arbitration clause within the TK/FL Contracts. The cited arbitration provision in the TK/FL Contracts states:

> 23.1    All disputes arising **between both parties** in connection with or in the performances of the Contract shall be settled through friendly consultation **between both parties**. In case no agreement can be reached through consultation after a maximum period of 30 days ... any such dispute shall be submitted to arbitration.

(Doc. 1-1, Verdier Decl. Exs. A, B, & C (filed under seal) (emphasis added).)

Tellingly, when (mis-)quoting this very language on page 3 of its Motion to Compel Arbitration (Doc. 6), GE Energy France conveniently omits the first "both" and instead claims that paragraph 23.1 applies to "[a]ll disputes arising between **the** parties ...." However, this is not what the TK/FL Contracts actually say. Instead, the plain language limits the scope of any arbitration to disputes arising between "**both**" ThyssenKrupp Stainless USA, LLC and F.L. Industries Inc. Even assuming, *arguendo*, that Outokumpu's claims against Converteam are

---

[3] The Alabama Supreme Court will hear oral argument in that case on September 7, 2016.

connected to F.L. Industries' performance under the TK/FL Contracts, the contracting parties (TK Stainless and F.L. Industries) never contemplated that the arbitration agreement would govern tort and implied warranty claims **against other parties**.  The parties limited the scope of their arbitration provisions to "disputes arising **between both** parties in connection with or in the performances of the Contract ...."  The plain meaning of the term "**both**" refers to **two** people or entities, identified together.  In this instance, the term "**both**" refers only to the **two** signatories to the contract, TK Stainless and F.L. Industries.

Of course, if TK Stainless and F.L. Industries had desired to impose an arbitration obligation on other parties, they could have included other language to effectuate that goal.  They could have listed "'all disputes' without qualification or even 'all disputes arising in connection with the contract," *see Upper Lakes*, 2009 WL 4730762, at *2, or could even have included arbitration language saying, for example:  "This provision shall not only bind the parties, but shall bind the parties' assigns and also any vendors and sub-contractors performing part of the parties' scope of work."  Any manner of language could have been used to impose arbitration on third parties, but TK Stainless and F.L. Industries did not include any of this language when providing for limited arbitration under paragraph 23.1 of the TK/FL Contracts.

The *Upper Lakes* decision is instructive.  There, the district court denied arbitration sought by a manufacturer of a ship propeller who was not party to the prime contract featuring the arbitration clause.  *Upper Lakes*, 2009 WL 4730762, at *4.  Upper Lakes (as "Buyer") and another party, MaK (as "Vendor"), entered into a purchase agreement for an entire shipping vessel.  *Id.* at *1.  Three months later, MaK entered into a purchase agreement and "consortium agreement" with Caterpillar for some components of the ship.  Next, Caterpillar subcontracted with ZF Padova, a foreign entity, for the design and manufacture of the pitch propeller.  When

28073433 v1

the pitch propeller failed and damaged Upper Lakes' ship, Upper Lakes sued ZP Padova in negligence and products liability. *Id.* However, no contract existed between Upper Lakes and ZF Padova.

ZF Padova moved to compel Upper Lakes to arbitration under the New York Convention. The court considered the following clause from the Upper Lakes-MaK Contract, which was almost identical to the subject clause Converteam relies on from the TK/FL Contracts:

> All disputes arising **between both Parties** in connection with the present contract shall be settled through friendly consultations **between both Parties**. In case no agreement can be achieved through consultations, it shall exclusively be submitted to arbitration for settlement under the Rules of Arbitration of the International Chamber of Commerce by three (3) arbitrators appointed in accordance with said rules.

*Id.* at *1 (emphasis added). ZP Padova, the party seeking arbitration also argued that, because Upper Lakes was aware it would be supplying parts pursuant to the MaK Contract, the dispute was related to the Upper Lakes-MaK Contract and its arbitration agreement. However, the court denied arbitration, reasoning:

> The arbitration provision in the MaK Contract is limited to "disputes arising *between both Parties*...." It does not say "all disputes" without qualification or even "all disputes arising in connection with the contract" …. The arbitration provision in the MaK Contract is not the "broader form" of arbitration clause …. The arbitration provision itself is limited to disputes between the "Parties," which is expressly defined in the agreement as the combination of "Buyer" and "Vendor." Defendant is not a "party" to the MaK Contract in the generic sense, nor is it a "Party" as that term is defined in the agreement.
>
> ***
>
> … The fact that the parties to the MaK Contract were aware of Defendant's role when they entered into the agreement suggests that the arbitration provision, as drafted, was intended to exclude Defendant. Rather than agree to a provision applying broadly to all disputes arising in connection with the agreement, including disputes involving the members of MaK's consortium or disputes

> involving the manufacturer or original supplier of the purchased parts, the parties to the MaK Contract agreed to an arbitration clause that is expressly limited to both parties, the "Buyer" and the "Vendor."

*Id.* At *2-3 (citations omitted).  The court held:   "The plain text of the agreement indicates that disputes between Plaintiff and Defendant are not included within the scope of the arbitration clause.   *** The Court concludes that the arbitration provision is limited to disputes between Plaintiff and MaK; it does not cover the instant dispute between Plaintiff and Defendant."  *Id.* at *2-3.  In denying the arbitration, the court also noted it was bound to "enforce the agreement according to its plain meaning."  *Id.*

The case *sub judice* features a scenario strikingly similar to that of *Upper Lakes*.  Both cases featured domestic owners (the "Buyer") who contracted for a manufactured product with a domestic contractor (the "Seller" or "Vendor").  Both cases featured foreign sub-contractors who were hired to design and manufacture a component of the product, and this component proved defective.  Both cases featured allegations by the owner against the sub-contractor sounding exclusively in tort.  In both cases, the sub-contractor sought to impose arbitration under the New York Convention based on a principal contract (between two U.S. companies) that the sub-contractor was not party to.  Both cases feature dispute-resolution clauses that limit arbitration to "disputes between both parties."

GE Energy France's Notice of Removal and its Motion to Compel Arbitration require this Court to the reach different, nonsensical conclusion that the drafters of the term "both" actually means "many," including the hundreds of potential sub-contractors and vendors listed in "Annex A3."  *See Cont'l U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F. Supp. 809, 814 (S.D.N.Y. 1987) (non-signatory cargo owner could not compel arbitration pursuant to an agreement that required arbitration for "any dispute aris[ing] between Owners and the

Charters ...”; the court explained: “[P]arties are free to choose their contractual language, and an arbitration clause governing ‘all disputes arising out of this charter’ is meant to have a much broader application than one governing disputes between ‘owners and the charterers.’”). Paragraph 23.1’s reference to “both parties” expressly takes the dispute-resolution provisions out of paragraph 1.2 “interpretation” that “Seller” should be “understood as Sub-contractors included, except if expressly stated otherwise.”  TK Stainless’s and F.L. Industries’ decisions **not** to include Converteam or any other sub-contractor within the dispute-resolution clauses should end the Court’s subject-matter jurisdiction analysis.  This Court should deny arbitration and remand.

### 2.    There Is No Federal-Question Jurisdiction Because GE Energy France Is Not a Signatory To the Agreement It Seeks To Enforce.

Of course, even if GE Energy France could make the argument that Converteam, as a “Sub-contractor” was a “Party” to the TK/FL Contracts, GE Energy France fails to bring this Court a signed writing as required by the New York Convention and the *Bautista* factors.  Even if the TK/FL Contracts could be considered an “in writing” agreement to arbitrate, Article II of the Convention clearly requires the agreement be signed **by both parties, including the proponent of arbitration**.  *See* New York Convention, *supra.*, 21 U.S.T. 2517.  The Convention’s party signature requirement is stricter than the FAA’s general requirements (which do not confer federal-question jurisdiction for a removing defendant).  *See* Restatement (Third) of Foreign Relations Law, § 487, Comment D (1987). (“The United States Arbitration Act, 9 USC § 2 ... require[s] that an agreement to arbitrate be in writing, but the agreement need not be signed by the parties.  The Convention requires the agreement to be in writing and signed by the parties ....”).  Here, on page 68 of the TK/FL Contracts, Dr. Michael Rademacher and Michael

Lutter signed on behalf of TK Stainless, as did Jean Ledoux on behalf of F.L. Industries.  There are no other signatories.  (*See* Doc. 1-1, Verdier Decl. Exs. A, B, & C (filed under seal).)

Even if GE Energy France could plead a writing to which it (via F.L. Industries and Converteam) and Outokumpu (via TK Stainless) are party, there is no pleading or other basis for determining that GE Energy France (via Converteam) was a signing party, as required by the Convention.  This same fatal deficiency was recognized by the district court in *Rolls-Royce PLC v. Royal Caribbean Cruises Ltd.*, Case No. 03-23214, 2005 U.S. Dist. LEXIS 45416 (S.D. Fla. July 8, 2005).  In remanding a claim back to state court, the court explained:

> Having reviewed the language of the Convention, the Court finds that it contemplates an agreement in writing signed by the parties that appear before the court to compel arbitration. Article II begins by stating that signatories to the Convention shall recognize an "agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen." Article II of the Convention then specifically states that by the term "agreement in writing," the Convention refers to an agreement "signed by the parties."
>
>            \*\*\*
>
> Because there is no agreement signed by Petitioners Rolls-Royce/ Alstom and Respondent Royal Caribbean to arbitrate disputes arising from their business relationship, there is no "agreement in writing, signed by the parties" as required by the Convention. Accordingly, this Court lacks subject matter jurisdiction.

*Id.* at \*22-23 (citing Convention, at art. II, sec. 2); *see also Segersboll v. Celebration Cruise Operator, Inc.*, No. 13-60644-CIV, 2013 WL 1975690, at \*4 (S.D. Fla. May 13, 2013 ("The Court agrees with the analysis in *Rolls Royce*, and will therefore proceed to determine whether Defendant is a signatory to the Agreement for purposes of the Convention"); *Bothell v Hitachi Zosen Corp.*, 97 F. Supp. 2d 1048, 1052 (W.D. Wash. 2000) (denying arbitration and remanding to state court based on signatory requirements of Article II because "there are no documents

signed by both Atlas and the defendants that contained either the Hitachi arbitration clause or a reference to the Hitachi arbitration clause.").

GE Energy France seeks to sidestep the party-signature requirements of the New York Convention by stringing together a number of clauses in the TK/FL Contracts: "GE Energy was a 'Sub-contractor' to FLI; 'Seller' expressly included FLI's 'Sub-contractors'; and 'Seller' is one of the 'parties' to the Agreement." (Doc. 6, p. 6.) However, 'Sub-contractor' is a defined term under paragraph 1.2 the FL/TK Contracts and is differentiated from the "Seller": "'Sub-contractor' or 'Sub-supplier' means any person (**other than the Seller**) used by the Seller for the supply of any part of the Contract, or any person to whom any part of the Contract has been sub-let by the Seller and the Sub-contractor's legal successors in title, but not any assignee of the Sub-contractor." (emphasis added). Nowhere does GE Energy explain how Jean Ledoux of F.L. Industries was authorized **to sign** the TK/FL Contracts on Converteam's (much less GE Energy France's) behalf on November 25, 2007, especially when Converteam itself had not even entered the alleged "Agreement for Consortial Cooperation" with F.L. Industries and DMS SA until almost a month later, on December 18, 2007. (*Compare* Doc. 1-1, Verdier Decl. Exs. A, B, & C (dated Nov. 25, 2007) *with id.*, Ex. D (dated Dec. 18, 2007) (filed under seal).[4])

---

[4] GE Energy France has yet another problem in using this subsequent alleged "Agreement for Consortial Cooperation" to make itself a "Party" to the earlier TK/FL Contracts. The alleged "Agreement for Consortial Cooperation" has three "Parties" (defined differently than under the TK/FL Contracts):  (i) F.L. Industries, (ii) DMS SA, and (iii) Converteam.  GE Energy France seeks to connect itself to one of these three "Consortium Parties" by explaining that it is the entity "formerly known as Converteam."  (*See* Doc. 1-1, Verdier Decl. ¶ 2.)  Even assuming, *arguendo*, both that the TK/FL Contracts now have some connection to Outokumpu's tort claims against Converteam and that Converteam can use the subsequent alleged "Agreement for Consortial Cooperation" to bootstrap a connection to the earlier TK/FL Contracts, GE Energy France's argument on arbitrability requires it to prove that GE Energy France also fits narrowly within a succession of definitions in the TK/FL Contracts, as (1) a "legal successor in title" to (2) a "Sub-contractor," that, in turn, might fall within the definition of (3) that "Seller" that might fall within the definition of  (4) a "Party," that, in turn, is involved in a (5) "dispute" between the

Because GE Energy France has not presented a written agreement it signed with Outokumpu and providing for arbitration, the federal court lacks subject-matter jurisdiction under the FAA amendments applying the New York Convention, and this dispute should be remanded to state court.

### 3. There Is No Federal-Question Jurisdiction Because the Signatories To the TK/FL Contracts Were Domestic Companies.

The pleading deficiencies in GE Energy France's Notice of Removal become even more apparent when examining the fourth *Bautista* element. The New York Convention will not apply to a dispute that is "entirely domestic in scope." A matter is "entirely domestic" if it "aris[es] out of ... a [legal] relationship which is entirely between citizens of the United States, does not "involve property located abroad," "does not envisage performance or enforcement abroad," and "does not have some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.

The relied-upon arbitration provision in the TK-FL Contracts is part of an agreement entirely between U.S. entities. The very first page of the TK/FL Contracts notes that both signatories – ThyssenKrupp Stainless and F.L. Industries – are Delaware companies. The same information is cited in GE Energy France's Notice of Removal.

The Second Circuit Court of Appeals has noted:

> In testimony before the Senate Foreign Relations Committee, the Chairman of the Secretary of State's Advisory Committee on Private International Law, Richard D. Kearney, testified as follows:

---

(6) other of "both parties" (7) "in connection with or in the performances of the [TK/FL] Contract." (*See* Doc. 6, p. 6.) Depending on the nature of the corporate transactions between GE Energy France and Converteam, it is certainly plausible that GE Energy might not even have the status of a "legal successor in title" to Converteam, meaning that GE Energy France would fail the first step and would never even leave the starting gate. None of this can be known without limited discovery, as explained in Section III.C., *infra*.

> We have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved, such as property located abroad, the performance of a contract in a foreign county (sic), or a similarly reasonable relation with one or more foreign states. The reasonable relationship criterion is taken from the general provisions of the Uniform Commercial Code. Section 1-105(1) of the code permits the parties to a transaction that bears a reasonable relationship to any other state or nation to specify that the law of that state or nation will govern their rights and duties.

S.Rep. 702, 91st Cong., 2d Sess. app. at 6 (1970) ….

*Jones v. Sea Tow Services Freeport N.Y. Inc.*, 30 F.3d 360, 365 (2d Cir. 1994).  Here, the relationship between TK Stainless and F.L. Industries did not involve property located abroad, nor did it envisage F.L. Industries performing contractual obligations abroad. Outokumpu's Facility (the subject of the TK/FL Contracts) is located in Calvert, Alabama.[5]  Alabama was where the contract was entered into and where the CRMs were to be built and commissioned.

In its Notice of Removal, GE Energy France focuses not on the named signatories, but instead argues that it (a non-signatory) is French.  GE Energy France argues that, as "a Subcontractor under the Supply Contracts," the relationship between it and Outokumpu (**not** the relationship between ThyssenKrupp Stainless USA, LLC and F.L. Industries Inc.) has "a reasonable relation with one or more foreign states."  GE Energy France argues that it "designed, engineered, and manufactured the motors … in Nancy, France" and "shipped the motors … from France."  (Doc. 1, Notice of Removal, ¶ 18.)  Further, GE Energy France claims that Germany is the locale for the putative arbitration and that German law applies to the suit.

---

[5] The TK/FL Contracts name the site location as nearby "Mt. Vernon."  (*See* Doc. 1-1, Verdier Decl. Exs. A, B, & C, Contracts, p. 4.)

18

GE Energy France, for all its alleged internationalism, is still focused on the wrong relationship. It is seeking to compel arbitration through an agreement between TK Stainless and F.L. Industries. GE Energy France's (or Converteam's) own alleged actions and work under a sub-contract are entirely separate from these TK-FL Contracts which feature the dispute-resolution clause and should be the focus of the inquiry.

Whether F.L. Industries sub-contracted with international companies would be relevant **if** the alleged sub-contract (such as the alleged "Agreement for Consortial Cooperation") contained the relevant arbitration clause[6] **and if** the suit were between F.L. Industries and Converteam. However, neither is the case here. A domestic entity (such as TK Stainless) who contemplates arbitrating a dispute with another entity (here, F.L. Industries), should not open or subject itself to international arbitration simply because the party it contracts with decides to sub-contract with a foreign entity or simply because a product it purchases features a part made in a foreign country. Such a result would be particularly perverse here because the TK/FL Contracts expressly provide, in paragraph 12.2: "The Seller shall use reasonable efforts to consider services and supplies from companies based in the State of Alabama under competitive conditions." (Doc. 1-1, Verdier Decl. Exs. A, B, & C.) Moreover, if sub-contracts could create the relationship with "one or more foreign states," any arbitration over a commercial injury would be subject to the New York Convention if the product featured a part manufactured in a foreign state, and this would serve to force U.S. businesses and even private citizens to arbitrate in foreign countries without their agreement. Such a rule would take control of the arbitration

---

[6] The "Agreement for Consortial Cooperation" contains an arbitration clause in Article XI, but that clause contemplates arbitration in "Paris" (presumably, France, not Texas). Converteam is **not** invoking that clause (which applies to disputes between F.L. Industries, Converteam, and DMS SA) and instead is seeking arbitration in Düsseldorf, Germany (**not** Paris) under the TK/FL Contracts.

process away from contracting parties, and place them at the mercy of others they have not even met or, in some cases, knew existed.  This troubling hypothetical may be the result GE Energy France is hoping for in this case, but it is not and has never been the law.

Whether the subject arbitration clause envisages enforcement in Germany or seeks to apply German law also has nothing to do with Outokumpu's dispute with Converteam. GE Energy France cannot point to aspects of the principal contract it was not party to in order to support its claim that the New York Convention applies here.  Case law is well-settled that mere reference to an international locale for arbitration or the application of international law does not, by itself, establish a "reasonable relation" with a foreign state as to properly invoke the Convention. *See Jones v. Sea Tow Services Freeport N.Y. Inc.*, 30 F.3d 360, 365 (2d Cir. 1994) (holding that salvage agreement between U.S. citizens was not subject to the Convention because it had no reasonable relation to any foreign state); *Armstrong v. NCL (Bahamas) Ltd.*, 998 F. Supp. 2d 1335, 1339 (S.D. Fla. 2013) (granting motion to remand where proponent failed to meet its burden of proving a sufficient foreign nexus where parties to the arbitration clause were both U.S. citizens).

In *Sea Tow*, the movant argued that the New York Convention applied to a contract between domestic entities because the clause stated that English law applied and called for arbitration in England.  The Second Circuit Court of Appeals, however, explained that the "reasonable relationship" with the foreign country could not be established through the language of the clause itself.  *See Sea Tow*, 30 F.3d at 365-66 ("The reasonable relation requirement necessary to make the arbitration provision in the LOF cognizable under the Convention cannot be fulfilled by the terms of the LOF itself.").

Just as there was insufficient evidence to establish a reasonable relation with England in *Sea Tow*, GE Energy France has shown no important or meaningful connection with Germany outside of the arbitration clause itself and therefore cannot show that the TK/FL Contracts were not "entirely domestic" such that the Convention may apply

## B.     Alternatively, Even if Jurisdiction Exists, There Is No Basis for Arbitration.

Even if this Court retains subject-matter jurisdiction and takes up the merits of GE Energy France's Motion to Compel Arbitration, the motion should be denied. "A party who attempts to compel arbitration must show [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." *Intergen N.V. v Grina*, 344 F.3d 134, 142 (1st Cir. 2003). The movant has the burden of proving these elements by a "preponderance of the evidence." *Acher v Fujitsu Network Commc'ns, Inc.*, 354 F. Supp. 2d 26, 36 (D. Mass. 2005).

GE Energy France has failed even the first element.  Even if this dispute were encompassed by the dispute-resolution clauses in the TK/FL Contracts, GE Energy France has pleaded nothing to show that it "appeal[ed] for the arbitration tribunal" after a "maximum period of 30 days" of "friendly consultation," as required under paragraph 23.1 of the TK/FL Contracts.

More to the point, GE Energy France has no agreement to arbitrate with Outokumpu. Arbitration must be based on a voluntary agreement between the parties.  GE Energy France seems to suggest it somehow stepped into the shoes of F.L. Industries by virtue of the alleged "Agreement for Consortial Cooperation"  or some other undisclosed sub-contract.

This argument is facially absurd.  Having had no opportunity to conduct discovery, Outokumpu has no idea what the nature of Converteam's relationship with F.L. Industries was other than what GE Energy France has pleaded.  What is clear, however, is that paragraph 12.1 of

21

the TK/FL Contracts prohibited F.L. Industries from assigning its rights under the Contracts without the permission of TK Stainless.  Under paragraph 12.2 of the TK/FL Contracts, F.L. Industries took responsibilities for its sub-contractors, but this clause, notably, confers no rights on sub-contractors themselves.

The circumstances under which a court will allow a non-signatory to compel a signatory to arbitrate are limited.  A non-signatory can enforce an arbitration agreement against a signatory to the only under limited circumstances.  For example, a non-signatory might be able to enforce arbitration against a signatory where "the relationship between the signatory [here, F.L. Industries] and non-signatory defendant [here, GE Energy France] is so close that only by permitting the non-signatory to invoke arbitration may evisceration of the underlying arbitration agreement be avoided." *MS Dealer Serv. Corp. v Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (quoting *Boyd v. Homes of Legend, Inc.*, 981 F. Supp. 1423, 1432 (M.D. Ala. 1999)), *abrogated on other grounds recognized by Life of the South Ins. Co.*, 648 F.3d 1166, 1171 (11th Cir. 2011) (insofar as *MS Dealer* did not make clear that "state law provides the rule of decision").  Another potential example is "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the non-signatory." *MS Dealer*, 177 F.3d at 947 (quoting *Sunkist Soft Drinks, Inc. v Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993)).

Neither scenario is in play here.  Regarding the latter, Outokumpu's claims against Converteam sound in tort and are independent of any written contract (though Outokumpu does plead implied warranty claims in the alternative).  Regarding the former, denying arbitration to GE Energy France in no way jeopardizes the right of F.L. Industries to seek arbitration of a dispute between Outokumpu and F.L. Industries, which is exactly what another entity, Fives St

Corp. ("Fives"), is already doing.  In an on-going, separate litigation between Outokumpu and

Fives, Fives has sought arbitration under the same TK/FL Contracts now invoked by GE Energy

France.  Outokumpu has opposed arbitration, and the issue of arbitrability that case is pending

before the Alabama Supreme Court.  However, in seeking arbitration under the TK/FL Contracts,

Fives argued that it and Outokumpu (identified as "OTK" in Fives' briefing) were **not** the named

parties to these Contracts but instead were "successors" or "assigns" to the named parties.  Fives

explained:

- "ThyssenKrupp, OTK's **predecessor** and part of a German group of companies, signed an agreement which required any potential dispute arising from a project in Alabama to be resolved by arbitration in Germany, applying German law."

- "Without entering into unnecessary debate over whether any assignment was validly made pursuant to clause 12.1, it is apparent that the parties proceeded on the basis that OTK and Fives were **respective successors** to ThyssenKrupp and F.L. Industries -- Fives St's **corporate succession** at least has been explained in Fives St's Memorandum of Law ...."

- "OTK's (and Fives St's) rights are the contractual rights negotiated and agreed to by OTK's own German **predecessor**, ThyssenKrupp.  OTK ... voluntarily acquired ThyssenKrupp's business and stepped into ThyssenKrupp's shoes as **its successor/assignee** to the Contracts."

- "OTK voluntarily decided to **take over** the Contracts from ThyssenKrupp ...."

- "OTK ... voluntarily acquired ThyssenKrupp's business and stepped into ThyssenKrupp's shoes as **its successor/assignee** to the Contracts."

- "Five [sic] ST is **not the named party** in the three contracts. **It is a different entity**."

(*See* Docs. 33-2, Fives Reply Mem. of Law, ¶¶ 8, 10 n.3, 12; *see also* Ex. A, attached, Transcript

for Oct. 30, 2015 hearing, p. 15 (emphasis added).)

Fives's own explanations speak volumes because, while a successor to a contract may

have rights to enforce that contract, he is **not** a party or signatory to that contract.  *See BP Envtl.*

*Servs. v. Republic Servs., Inc.,* 946 F. Supp. 2d 402, 413 (E.D. Pa. 2013) (differentiating

successors-in-interest from the parties to a contract); *Bank of Am. Nat'l Ass'n v. Bassman FBT, L.L.C.,* 981 N.E.2d 1, 5 (Ill. App. Ct. 2012) (same); *Grothaus v. Warner*, 2008-Ohio-6683, ¶ 4, 2008 WL 5265897 (Ohio Ct. App. Dec. 18, 2008) (same); *see also S. Energy Homes, Inc. v. Gary*, 774 So. 2d 521, 526-27 (Ala. 2000) (noting distinction between a contracting party and an assignee of a contracting party), *overruled, in part, on other grounds by Jim Burke Auto., Inc. v. McGrue*, 826 So. 2d 122 (Ala. 2002); *Andrews v. Grand Manor, Inc.*, No. CA 98-1295-P-C, 1999 U.S. Dist. LEXIS 15429, at *8 (S.D. Ala. July 13, 1999) (separating assignees from parties).

What is perhaps most telling about the Fives matter is that Fives, who claims to be a "successor," of some kind, to F.L. Industries, never asserted federal-question jurisdiction under the New York Convention amendments to the FAA. (*See, e.g.,* Doc. 33-1, Fives Mem. of Law (seeking to compel arbitration, but **not** invoking the New York Convention).) This is, presumably, because, unlike GE Energy and France Converteam, Fives recognizes (i) that it was not a signatory (i.e., "**not the named party**," *see* Ex. A, attached, Transcript, p. 15) to the TK/FL Contracts and (ii) that the TK/FL Contracts did not affect a foreign state (*Bautista* factors one and four). Fives, apparently, did not believe that it had a non-frivolous basis to assert the New York Convention.

At the very least, any right GE Energy France might have to arbitration under the New York Convention is derivative of, subject to, and lesser than the rights of Fives, who claims to be a "successor" to F.L. Industries. That Fives never chose to remove its litigation concerning the TK/FL Contracts under the New York Convention amendments to the FAA is not only damning to GE Energy France's present position; it effectively acts as a waiver of any right to compel international arbitration any affiliate or sub-contractor of F.L. Industries might possibly have

under the TK/FL Contracts.  For perspective, GE Energy France, a purported "sub-contractor," is claiming **more** rights to have federal-question jurisdiction via the allegedly international contracts than the self-proclaimed "successor" to a contract signatory is claiming.

> ### C.   Alternatively, This Court Should Allow Outokumpu To Take Limited Discovery Regarding the Alleged "Agreement of Consortial Cooperation."

In moving to compel arbitration, GE Energy France nowhere explains how the entity "formerly known as Converteam" became GE Energy France.  (*See* Doc. 1-1, Verdier Decl. ¶ 2.) Moreover, GE Energy France relies on a "Converteam" document that Outokumpu had not seen until its litigation against Fives St Corp. last year – namely, the alleged "Agreement for Consortial Cooperation."  (*See* Doc. 1-1, Verdier Decl. Ex. D (filed under seal).)  Outokumpu is not a signatory or party to that Agreement and has not yet been permitted any discovery regarding that Agreement in its litigation with Fives.  Because GE Energy France is now relying on the same alleged "Agreement for Consortial Cooperation" in its own Motion to Compel Arbitration, it is only fair that Outokumpu be permitted limited discovery regarding this Agreement, in the event that the Court retains subject-matter jurisdiction and before this Court grants any request for arbitration.  *See PCH Mut. Ins. Co. v. Casualty & Sur., Inc.*, 569 F. Supp. 2d 67, 78 (D.D.C. 2008) (allowing the parties to conduct discovery on the issue of arbitrability). Such limited discovery would allow Outokumpu to obtain basic information on, *inter alia*, where the "Agreement for Consortial Cooperation" came from, to confirm that it is authentic and still in effect (and hasn't been rescinded or superseded), and to confirm the nature of the relationship between GE Energy France and the actual signatories to this Agreement.  It makes no sense to send Outokumpu to arbitration, without any discovery, based on an alleged "Agreement for Consortial Agreement" that Outokumpu is not party to and never even saw until last year.

## IV.
## <u>CONCLUSION</u>

As shown above, this Court is without federal-question jurisdiction and should remand this case to state court.

Respectfully submitted,

*s/ Devin C. Dolive*

Ricardo A. Woods (WOODR1019)
David G. Wanhatalo (WANHD6977)
Devin C. Dolive (DOLID4671)

Attorneys for Plaintiff
OUTOKUMPU STAINLESS USA, LLC

<u>**OF COUNSEL:**</u>

BURR & FORMAN LLP
RSA Tower, Suite 22200
11 North Water Street
Mobile, Alabama  36602
Telephone: 251-344-5151
Facsimile:  251-344-9696
rwoods@burr.com

BURR & FORMAN LLP
420 North 20th Street
Wells Fargo Tower, Suite 3400
Birmingham, Alabama  35203
Telephone:  205-251-3000
Facsimile:   205-458-5100
ddolive@burr.com
dwanhatalo@burr.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on August 17, 2016, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Mark E. Spear
SPEAR, SPEAR & HAMBY, P.C.
Post Office Box 1347
Mobile, Alabama  36633

Sara Anne Ford
Wesley B. Gilchrist
Amie A. Vague
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building, 400 North 20th Street
Birmingham, Alabama  35203-3200

*s/ Devin C. Dolive*
OF COUNSEL