IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| OUTOKUMPU STAINLESS USA LLC, *et al.*,     Plaintiffs, | )<br>)<br>)<br>) |
| v. | )     CIVIL ACTION NO. 16-00378-KD-C |
| CONVERTEAM SAS, a foreign corporation now known as GE ENERGY POWER CONVERSION FRANCE SAS, CORP.,     Defendant. | )<br>)<br>)<br>)<br>)<br>) |

## ORDER

This action is before the Court on the motion to compel arbitration and to dismiss filed by Defendant GE Energy Power Conversion France SAS, Corp., formerly known as Converteam SAS (GE); the response filed by Sompo Japan Insurance Company of America, Pohjola Insurance Limited, AIG Europe Limited, Tapiola General Mutual Insurance Company, AXA Corporate Solutions Assurance SA UK Branch, HDI Gerling UK Branch, MSI Corporate Capital Ltd., and Royal & Sun Alliance PLC (the Insurers); the response filed by Outokumpu Stainless USA, LLC (OTK); GE's reply; the Insurers' reply; and OTK's reply (docs. 6, 34, 35, 38, 41, 42). Upon consideration, and for the reasons set forth herein, the motion to compel arbitration (doc. 6) is **GRANTED** and this action is referred for arbitration in accordance with the terms of the Supply Agreements. Accordingly, the motion to dismiss is **GRANTED.**[1]

---

[1] This action is also before the Court on GE's motion to supplement, OTK's response, the Insurer's response, GE's reply and OTK's supplemental response (docs. 58, 59, 60, 61, 65). GE moved to supplement its motion to compel arbitration by adopting and incorporating by reference the facts and arguments regarding equitable estoppel in its reply. The motion (doc. 58) is DENIED. The Court has determined that OTK and GE are parties to the Supply Agreements and therefore, need not address GE's equitable estoppel argument.

I. Background

On November 25, 2007, Thyssenkrupp Stainless USA, LLC (TK Stainless) entered into three separate contracts, Supply Agreements 1001, 1002, and 1003, with F.L. Industries Inc. now known as Fives St Corp. (FLI), for the purchase of three Cold Rolling Mills for its stainless steel manufacturing facility in Calvert, Alabama (docs. 5-1, 5-2, 5-3, under seal). Each Supply Agreement identifies TK Stainless as the "Buyer" and FLI as the "Seller" and refers to them "collectively as 'Parties'" (Docs. 5-1, 5-2, 5-3, p. 5). The Supply Agreements further provide an agreed interpretation that "[w]hen Seller is mentioned it shall be understood as Sub-contractors included, except if expressly stated otherwise." (Docs. 5-1, 5-2, 5-3, p. 9, § 1.2. "Interpretations")  "Sub-contractor" is defined as "any person (other than the Seller) used by the Seller for the supply of any part of the Contract Equipment, or any person to whom any part of the Contract has been sub-let by the Seller[.]" (Id., §1.1 "Definitions").  "Contract Equipment" means the mill and "all equipment, machines, parts, components and/or spare parts, to be delivered as stipulated within the Seller's scope of supply." (Id. at p. 7).

Pursuant to the Supply Agreements, FLI was to engage subcontractors and suppliers necessary for the completion of the work and the supply of equipment, etc. To that end, the Supply Agreements set out, in Annex A3, a list of "mandatory" vendors identified by TK Stainless from which FLI could select as suppliers of services and equipment, including, inter alia, Converteam, now GE (docs. 5-1, 5-2, 5-3, p. 91, under seal).  Subsequently, FLI entered into an Agreement for Consortial Cooperation (the Consortial Agreement) with GE and a third company, DMS SA (DMS) under which GE was to provide electrical equipment for the Cold Rolling Mills.  The Consortial Agreement states that GE was "acting as subcontractor[] of FLI" (doc. 5-4, p. 2). GE designed, engineered and manufactured the motors in France, which were

then shipped to and installed in TK Stainless's facility in Alabama.

Relevant to GE's motion to compel arbitration, Section 23.1 of the Supply Agreements provides, in pertinent part, as follows:

> All disputes arising between both parties in connection with or in the performances of the Contract shall be settled through friendly consultation between both parties. In case no agreement can be reached through consultation … any such dispute shall be submitted to arbitration for settlement.

(Docs. 5-1, 5-2, 5-3, under seal, at § 23.1)  The Supply Agreements further provide that arbitration shall take place in Dusseldorf, Germany, be "conducted in accordance with the Rules of Arbitration of the International Chamber of Commerce" and that the "substantive law of Federal Republic of Germany shall apply" (*id*. at § 23.2, 23.5).

In 2014, after OTK acquired the facility from TK Stainless, one of the motors supplied by GE (formerly Converteam) failed.  Inspection of the other motors supplied by GE showed similar issues as the failed motor.

On June 10, 2016, OTK and the Insurers filed this action against GE in the Circuit Court of Mobile County, Alabama.  OTK asserted causes of action for negligence, breach of professional design and construction warranties, breach of implied warranties, and product liability under the Alabama Extended Manufacturer's Liability Doctrine arising from the alleged failure of the motors supplied by GE (doc. 1-2).  The Insurers alleged that they paid OTK and its corporate parent Outokumpu Oyj under the policies for the losses claimed for the motors' failures. The Insurers assert that they are equitably and contractually subrogated to the rights of OTK and Outokumpu Oyj, to the extent insurance payments were made (*id.*).

On July 18, 2016, GE removed the action to this Court.  GE alleged two jurisdictional grounds: (1) federal subject matter jurisdiction pursuant to 9 U.S.C. § 205, which authorizes

removal of an action where the subject matter of the suit "relates to" an arbitration agreement "falling under" the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention); and (2) diversity jurisdiction based upon the fraudulent joinder of the Insurers as plaintiffs. After removal, GE moved to compel arbitration as to OTK and Insurer Sompo and moved to dismiss the remaining Insurers (docs. 6,7).

On August 17, 2016, OTK and the Insurers moved to remand (docs. 34 and 35). The motions to remand and GE's motion to dismiss the claims of the Foreign Insurers were denied (doc. 57, Order adopting Report and Recommendation). GE's motion to compel arbitration is now pending before the Court.

II. Statement of the law

"The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention, is a multi-lateral treaty that requires courts of a nation state to give effect to private agreements to arbitrate and to enforce arbitration awards made in other contracting states. The United States, as a signatory to the Convention, enforces this treaty through Chapter 2 of the U.S. Federal Arbitration Act (FAA), which incorporates the terms of the Convention[.]" *Thomas v. Carnival Corp.*, 573 F.3d 1113, 1116 (11th Cir. 2009) (*abrogation on other grounds recognized by Williams v. NCL (Bahamas) Ltd.,* 686 F. 3d 1169 (11th Cir. 2009)). The Court of Appeals for the Eleventh Circuit, quoting the Supreme Court, "has explained that 'the principal purpose' behind the adoption of the Convention 'was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 545 (11th Cir. 2016) (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520

n. 15, 94 S. Ct. 2449 1974)).

"To implement the Convention, Chapter 2 of the FAA provides two causes of action in federal court for a party seeking to enforce arbitration agreements covered by the Convention: (1) an action to compel arbitration in accord with the terms of the agreement, 9 U.S.C. § 206, and (2) at a later stage, an action to confirm an arbitral award made pursuant to an arbitration agreement, 9 U.S.C. § 207." *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257 (11th Cir. 2011).

"In determining whether to compel arbitration under the Convention Act, a district court conducts 'a very limited inquiry.'" *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1285 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1158 (2016) (internal quotations and citation omitted) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005)). "An arbitration agreement falls within the jurisdiction of the New York Convention if: (1) the agreement is 'in writing within the meaning of the [New York] Convention'; (2) 'the agreement provides for arbitration in the territory of a signatory of the [New York] Convention'; (3) 'the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial'; and (4) a party to the agreement is not an American citizen or the commercial relationship has some reasonable relation with one or more foreign states." *Suazo,* 822 F.3d at 546 (quoting *Bautista*, 396 F.3d at 1294 n. 7) (bracketed text in original).  The Eleventh Circuit has held that "the Convention requires that a motion to compel arbitration must be granted 'so long as (1) the four jurisdictional prerequisites are met and (2) no available affirmative defense under the Convention applies.'" *Suazo,* 822 F. 3d at 546 (quoting *Lindo,* 652 F.3d at 1276).  "If these prerequisites are met, then the court should compel arbitration pursuant to the agreement unless the agreement is 'null and void, inoperative or incapable of being performed,' pursuant to Article II of the Convention." *Clair v. NCL (Bahamas), Ltd.*, 2013 WL 12128723, at *1

(S.D. Fla. June 5, 2013) (citing Convention, art. II (3); *Bautista*, 396 F.3d at 1301)) (footnote omitted). Overall, "a district court must be mindful that the Convention Act generally establishes a strong presumption in favor of arbitration of international commercial disputes." *Escobar v. Celebration Cruise Operator, Inc.,* 805 F. 3d 1279, 1286 (11th Cir. 2015) (internal quotations and citation omitted).

III. Analysis

GE argues that OTK's claims are subject to the arbitration provision in the Supply Agreements. GE argues that all four prerequisites for compelling arbitration as set forth in *Bautista* are met and therefore, the Court must compel arbitration.

Taking the prerequisites out of numerical order, GE, OTK and the Insurers do not dispute that Germany is a signatory to the Convention. Therefore, the second prerequisite, that the arbitration agreement should provide for arbitration in the territory of a signatory to the Convention, is met. *Bautista*, 396 F.3d at 1294 n. 7.

As to the first prerequisite, GE argues that the Supply Agreements are agreements in writing that include arbitration provisions, which fall within the meaning of the Convention. GE asserts that the Supply Agreements were signed by TK Stainless, the predecessor to OTK, as the "Buyer" and FLI as the "Seller" and that "Seller" as interpreted in §1.2 of the Supply Agreements includes GE, as FLI's sub-contractor. GE argues that use of the phrase "both parties" in the arbitration provisions, means the "Buyer" and "Seller", because the arbitration agreement specifically provides that "Buyer" and "Seller" will be referred to collectively as the "parties".

In response, OTK and the Insurers argue that use of the phrase "both parties" in the arbitration provisions limits the signers to only two parties – TK Stainless as "Buyer" and FLI

6

as "Seller" – and operates to expressly exclude subcontractors like GE from the interpretation of "Seller".  OTK and the Insurers assert that since neither GE nor OTK signed the Supply Agreements, they were not signed by the parties to the litigation as contemplated under the Convention. Therefore, they argue that GE cannot enforce the arbitration provisions.

"The term 'agreement in writing'" is defined by the Convention as "an arbitral clause in a contract or an arbitration agreement, signed by the parties[.]"  Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Article 2, § 2.  The parties are identified in the Supply Agreements as TK Stainless, now known as OTK,[2] the "Buyer" and FLI, the "Seller" and that they may be referred to individually as "Party" or "collectively as 'Parties'" (docs. 5-1, 5-2, 5-3, p. 5) ("(Buyer and Seller also referred to individually as "Party" and collectively as "Parties")") (parenthetical in original). The Supply Agreements also provide that "[w]hen Seller is mentioned it shall be understood as Sub-contractors included, except if expressly stated otherwise." (Docs. 5-1, 5-2, 5-3, p. 9, § 1.2. "Interpretations").  Thus, in order for GE to be excluded from "Seller" or "Party" when referring to "Seller", or "Parties" when referring to both "Seller" and "Buyer", the Supply Agreement must "expressly state[] otherwise." (Id.)

Viewing the Supply Agreements as a whole and construing any ambiguities against TK Stainless as the drafter,[3] the Court finds that the plain language of the arbitration provisions,

---

[2] OTK did not sign the Supply Agreements. However, in the state court action wherein OTK seeks to enforce a breach of contract action against the Seller FLI based on these same Supply Agreements, OTK identified itself as "Plaintiff[] Outokumpu Stainless USA, LLC, formerly known as ThyssenKrupp Stainless USA, LLC" (doc. 38-4, p. 2, Complaint, *Outokumpu Stainless USA, LLC and Sompo Japan Insurance Company of America v. Fives St. Corp.*, Civil

[3] *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) ("Under general contract principles, the plain meaning of a contract's language governs its interpretation. The court must look at the contract as a whole, the parties, and the purpose of the agreement to best determine the intent of the parties in interpreting the agreement. If no other contract principles (Continued)

7

supports a reasonable interpretation that subcontractors are not expressly excluded from the meaning of "parties" in the arbitration provisions.  There is simply no express statement, as required by the Supply Agreements, whereby the subcontractors are excluded as "Seller" or "parties".[4]  *See Interested Underwriters at Lloyd's v. M/T San Sebastian*, 508 F. Supp. 2d 1243, 1251 (N.D. Ga. 2007) (applying generally accepted principles of contract law to find that parties had an agreement in writing within the meaning of the New York Convention); *Sea Bowld Marine Group, LDC v. Oceanfast Pty, Ltd.,* 42 F. Supp. 2nd 1305, 1313 (S.D. Fla. 2006) (explaining that a "number of courts from wide-ranging jurisdictions have also concluded that federal law governs the question of arbitrability regardless of choice-of-law and arbitration clauses referencing foreign law" and applying federal law to determine arbitrability under the New York Convention) (collecting cases); *Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1364 (11th Cir. 1995) (… "federal law comprising generally accepted principles of contract law controls the question of

---

point to a particular meaning, the court will prefer the reasonable interpretation that operates more strongly against the party who drafted the document.") (citations omitted) (applying general contract principles to a forum selection clause).

[4] OTK arrived at a similar interpretation in its response to FLI/Fives motion to compel arbitration in the state court action -  "The language [of the Supply Agreements] reflects the intent that the alleged arbitration clause will only encompass ThyssenKrupp and those who sue ThyssenKrupp after 'friendly consultation.' For instance, in the definition of parties on page 4 of the contract, ThyssenKrupp is the only defined 'buyer' and, therefore, the only party to the Contracts. … *Not only F.L. Industries, but also any subcontractors of F.L. Industries are defined as 'sellers' and, therefore, are parties to the Contracts.* … Thus, if a dispute arose under the contract between both parties (ThyssenKrupp and F.L. Industries), ThyssenKrupp could arbitrate in Germany. This is as far as the language of the alleged arbitration clause extends, and the clause should be confined to these parameters." (Doc. 38-1, p. 16) (emphasis added).

arbitrability."). [5]  Given the directive that the district courts "must be mindful that the Convention Act generally establishes a strong presumption in favor of arbitration of international commercial disputes[,]" *Escobar,* 805 F. 3d at 1286, the Court finds that the first prerequisite has been met.

As to the third prerequisite, that the arbitration agreement arise out of a commercial legal relationship, whether contractual or not, *Bautista*, 396 F.3d at 1294 n. 7, 9 U.S.C. § 202, GE argues that the Supply Agreements arise out of a multi-million dollar legal commercial relationship between OTK and FLI.  The Insurers assert that this prerequisite is not met because GE supplied the motors pursuant to the Consortial Agreement and not the Supply Agreements. OTK concedes that "at least as between TK Stainless and F.L. Industries, the legal relationship under the TK/FL Contracts involved a multi-million-dollar purchase of equipment and is undoubtedly commercial." (Doc. 35, p. 11, n. 2)

Pursuant to the Convention, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202.  Thus, the Court looks to whether the legal relationship, giving rise to the arbitration agreement is commercial. As the parties have indicated, the legal relationship exists because FLI supplied motors made by GE to TK Stainless for the construction of multi-million dollar cold steel rolling mills.  While the parties may dispute

---

[5] 21 Williston on Contracts § 57:56 (4th ed.) ("If a dispute arises under either the maritime or commerce provisions of the Federal Arbitration Act, the arbitration provision is enforceable regardless of the rules of the jurisdiction in which the claim arose. But where a case is in a federal court, and neither a maritime transaction nor a transaction involving commerce within the meaning of § 2 of the Act is at issue, the law of the state in which the case arises governs the arbitration.").

whether GE supplied the motors pursuant to the Consortial Agreement or the Supply Agreements, there is no legitimate dispute that the arbitration agreements arose out of a legal commercial relationship.  Therefore, the third *Bautista* prerequisite is met.

As to the fourth *Bautista* prerequisite, that "a party to the agreement is not an American citizen or the commercial relationship has some reasonable relation with one or more foreign states" *Suazo,* 822 F.3d at 546 (quoting *Bautista*, 396 F.3d at 1294 n. 7), GE argues that by virtue of the interpretation of "Seller" to include the subcontractors, it is a party to the Supply Agreements, and it is not an American citizen.  GE also argues that the commercial relationship created by the Supply Agreements has a reasonable relation with Germany and France.  GE points out that the Supply Agreements were generated by TK Stainless, an American subsidiary to a German parent corporation, as a result of planning and negotiations, which occurred in Germany and France.  GE states that the first three design meetings after the Supply Agreements were signed were held in Germany and France. GE also points out that the motors were made in France and sent to Alabama for installation.

OTK and the Insurers again argue that GE is not a party to the Supply Agreements.  They also argue that the Supply Agreements do not have a reasonable relation with one or more foreign countries.  In support, they point out that the parties signed the Supply Agreements in Alabama, that the parties TK Stainless and FLI were American corporations, and their agreement was for the construction of cold role steel mills in Alabama. OTK assert that having parts supplied by foreign entities such as GE, does not meet the requirement of a reasonable relation with one or more foreign countries.

Pursuant to the New York Convention, "[a]n agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall

under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.  "The question under this fourth inquiry is whether 'there is a reasonable connection between the parties' commercial relationship and a foreign state that is independent of the arbitral clause itself.[6]'" *Armstrong v. NCL (Bahamas) Ltd.*, 998 F. Supp. 2d 1335, 1338 (S.D. Fla. 2013) (citing *Ensco Offshore Company v. Titan Marine L.L.C.*, 370 F.Supp.2d 594, 597 (S.D. Tex.2005) (quoting *Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 339–340 (5th Cir.2004)).

Since the Court has determined that GE is a party to the Supply Agreement by virtue of the interpretation of "Seller" as including the subcontractors, the fourth *Bautista* prerequisite is met. Even if GE were not a party, there are sufficient connections with one or more foreign states.  While OTK and FLI are American corporations,[7] they are both subsidiaries of foreign parent corporations.[8]  Moreover, the planning phase for the cold steel mills appears to have occurred in Germany and the Supply Agreements called for at least the first three design review committee meetings to be held in Germany and France. Also, the Supply Agreements contain a list of mandatory vendors many of which are not U.S. companies.  The Court finds that the

---

[6] "[F]oreign arbitration sites and choice of law provisions do not themselves establish a foreign connection." *Smith-Varga v. Royal Caribbean Cruises, Ltd.*, 2013 WL 3119471, at *3 (M.D. Fla. June 18, 2013).

[7] "For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." 9 U.S.C. § 202.

[8] The parties do not dispute that OTK is a Delaware corporation. Outokumpu Americas, Inc. is the sole member of OTK. However, Outokumpu Oyj of Finland is the ultimate corporate parent for Outokumpu Americas, Inc. (doc. 30, corporate disclosure statement). The parties have identified FLI now known as Fives as the U.S. subsidiary (Delaware) of a French corporation (doc. 38, p. 3, doc. 38-5).

fourth prerequisite has been met.

IV. Sompo as subrogee of OTK

GE moves to compel Sompo to arbitrate its claims against GE on basis that Sompo is the subrogee of OTK, its insured, and stands in the shoes of OTK (doc. 6, p. 9-10). The parties do not dispute that Sompo insured OTK or that it has certain subrogation rights as insurer. Accordingly, the Court finds that Sompo is bound by the same arbitration provisions in the Supply Agreements as its insured, OTK, and therefore, must submit to arbitration. *See Alstom Brasil Energia e Transporte Ltda. v. Mitsui Sumitomo Seguros S.A.*, 2016 WL 3476430, at *4–5 (S.D.N.Y. June 20, 2016) (finding that the "Mitsui-Alunorte insurance contract gave Mitsui a clear subrogation right" and that "[b]y pursuing Alunorte's contract claim against Alstom, Mitsui was bound by the arbitration clause that would have bound Alunorte.") (collecting cases).

V. Limited discovery regarding the Consortial Agreement

OTK argues that before the Court decides GE's motion to compel arbitration, the Court should allow OTK limited discovery on the issue of arbitrability. Specifically, OTK seeks discovery as to the corporate transactions between Converteam SAS and GE, and the Consortial Agreement between FLI and GE. OTK asserts that "it is certainly plausible that GE Energy might not even have the status of a 'legal successor in title'" to Converteam and that GE "nowhere explains how the entity 'formerly known as Converteam' became GE Energy France" (doc. 35, p. 19, n. 4, p. 27). OTK argues that limited discovery as to the Consortial Agreement would "confirm the nature of the relationship between GE Energy France and the actual signatories" to the Consortial Agreement. (Id.).

However, contrary to this argument, OTK states in its complaint that Converteam

changed its name to GE (doc. 1-2, p. 5 ("According to records on file with the Alabama Secretary of State, on or about February 25, 2013, Converteam changed its name to GE Energy Power Conversion France SAS, Corp.").  Since only a change of name has been alleged in the complaint, staying this action for limited discovery as to the corporate transactions between Converteam and GE is not necessary.  Moreover, although GE relies upon the Consortial Agreement as evidence of its status as a subcontractor to FLI, the operative documents affecting the issue of arbitrability are the Supply Agreements.  GE does not seek arbitration based upon the arbitration provision in the Consortial Agreement. Accordingly, the motion for limited discovery is denied.

VI. Conclusion

Upon consideration of the foregoing, the motion to compel arbitration (doc. 6) is **GRANTED.** Accordingly, OTK, Sompo and GE are referred for arbitration in accordance with the terms of the Supply Agreements. Accordingly, the motion to dismiss is **GRANTED**

DONE and ORDERED this the 30th day of January 2017.

/s/ Kristi K. DuBose
KRISTI K. DuBOSE
**UNITED STATES DISTRICT JUDGE**